UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------X

GEORGY USOV,

                Plaintiff,            13 Civ. 818

     -against-                  OPINION

MARC LAZAR, INC.,

                Defendant.

--------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        THE ROTH LAW FIRM, PLLC
        295 Madison Avenue, 22nd Floor
        New York, NY 10017
        By:  Richard A. Roth, Esq.



        Attorneys for Defendant

        NEIMAN & MAIRANZ P.C.
        39 Broadway
        New York, NY 10006
        By:  Marvin Neiman, Esq.
             Theodore Mairanz, Esq.

**Sweet, D.J.**

This action was tried before the Court on November 28 and 29, 2016, February 13 through 15, 2017, and April 3, 2017. In dispute are the obligations arising between two diamond merchants, Harvey Harris ("Harris") and Defendant Marc Lazar ("Lazar"), as reflected in memos from 2002 and 2006, and the events which followed. Plaintiff Georgy Usov ("Usov" or the "Plaintiff") is the father of Elena Harris ("Elena"), Harris' widow, and seeks judgment on her behalf. As is evidenced below, the oft-vaunted trust between diamond merchants, at least in this instance, does not survive death.[1]

Upon the following findings of fact and conclusions of law, judgment will be entered in favor of Plaintiff with costs and disbursements.

---

[1]  See generally Roger Starr, The Real Treasure of 47th Street, N.Y. TIMES, March 26, 1984, http://www.nytimes.com/1984/03/26/opinion/the-editorial-notebook-the-real-treasure-of-47th-street.html (observing that in the diamond community, there exists "a less tangible glue that holds them together: mutual trust").

1

## Prior Proceedings

This action was commenced on February 5, 2013. On June 18, 2013, Defendant's motion to dismiss was granted in part and denied in part.

On February 25, 2014, the parties stipulated and agreed that Plaintiff would file a motion to amend the complaint, which Plaintiff filed on March 7, 2014. On August 22, 2014, this Court granted in part and denied in part Plaintiff's motion to amend the complaint. On May 27, 2016, Defendant's motion for summary judgment on the Amended Complaint was denied.

A bench trial was held on November 28 and 29, 2016, February 13 through 15, 2017. Post-trial briefing and final arguments were completed on April 3, 2017.

## Findings of Fact

Having considered the testimonial evidence in conjunction with the admitted exhibits, it is found that although Elena, as Harris' widow, is an interested party, she was a straightforward, logical, and credible witness; her testimony

was confirmed by the adduced documentary evidence and the subsequent events. By contrast, Lazar was not a credible witness with respect to the understanding reached with Harris concerning the diamonds at issue; his testimony was not supported by the documentary evidence and his version of the subsequent events set forth below lacked logic and credibility. This finding undergirds the following findings of fact.

## I.    The Parties and Their Relationship

Usov, a citizen and resident of Russia, is Elena's father, a New York resident. Tr. 14, 184-5, 245.[2] Harris met Elena in Moscow in 2003, and the two were married in 2004. Tr. 13-14, 184-85. Harris died in May 2010, at age sixty-nine. Tr. 20; Joint Pretrial Order, Undisputed Facts at ¶ 2, Dkt. 145 ("Undisputed Facts").

Lazar is the sole owner of Defendant Marc Lazar, Inc. ("MLI" or the "Defendant"), a New York corporation. Tr. 377; Undisputed Facts at ¶ 1. Lazar and Elena first met in 2004 in Lazar's New York office. Tr. 21.

---

[2]    Citations to "Tr." refer to the trial transcripts dated November 28 and 29, 2016 and February 13 through 15, 2017.

Harris was a diamond dealer known for his expertise in fancy color diamonds; he wrote regularly for industry magazines and published the first authoritative book on fancy color diamonds. Tr. 14. Lazar and Harris had a professional relationship buying and selling diamonds and other precious stone from each another; their relationship also included loaning and borrowing monies from one another. Tr. 377; Undisputed Facts at ¶ 3.[3]

## II. The Small Diamond Collection

In 2002, Harris and Lazar entered into a consignment agreement for a diamond collection arranged to be consigned to Lazar (the "Small Diamond Collection").[4] Undisputed Facts at ¶ 11; Tr. 38; see Pl.'s Ex. 9. The parties understood that while Harris continued to own the diamonds, Lazar would attempt to sell the Small Diamond Collection, pay Harris the proceeds from

---

[3] The record contains several reported instances of borrowing and repaying money between the players involved in the instant litigation, such Harris, Lazar, and Pinnacle; such loans were regularly and timely repaid. See Tr. 65-67, 379-81; Pl.'s Exs. 32, 34.

[4] Consignment agreements are standard documents in the diamond business. Goods on consignment are given into the care of another who became responsible for the value of those goods; the consignee is responsible for paying the consignor for any sales of the goods. See Tr. 30, 38, 395.

the sale, and keep for himself a pre-arranged commission. Undisputed Facts at ¶ 11; Tr. 38-39. The consignment listed prices for the gems in the Small Diamond Collection which was "an indication of a floor" of a possible sales price for the stones. Tr. 39.

## III. **The Large Diamond Collection**

Through his work in the diamond business, Harris acquired a large diamond collection (the "Large Diamond Collection"). Tr. 16-17. The Large Diamond Collection's gem centerpieces were a 3.16 carat purplish red diamond recut to 2.99 carats and a 1.68 carat violet diamond, both the largest stones of their kind found in Australia's Argyle diamond mine. Tr. 16.

At some point, Harris became involved in an arbitration litigation with Andre Runte ("Runte"). Tr. 18. In connection with that litigation, Harris pledged the Large Diamond Collection as collateral. Id. Runte won the litigation with Harris but was uninterested in keeping the diamonds; rather, Runte was interested in the collateral's cash equivalent. Id.; see Undisputed Facts at ¶ 4.

In 2004, Harris informed Lazar about the opportunity to purchase the Large Diamond Collection from Runte. Undisputed Facts at ¶ 4. Harris and Lazar, with Elena as a witness, discussed how to obtain the Large Diamond Collection from Runte. Tr. 20. An agreement was reached between the parties to purchase the Large Diamond Collection from Runte for $1.1 million, with two-thirds of the funds coming from Harris and one-third of the funds coming from Lazar. Tr. 20-21; see Undisputed Facts at ¶ 5. To raise the $1.1 million, Lazar and Harris agreed that Lazar would sell a 8.36 carat blue-colored, pear-shaped diamond that belonged to Harris (the "Blue Stone"); Lazar ultimately sold the Blue Stone for a profit of approximately $1.479 million. Tr. 21-22; see Undisputed Facts at ¶ 6.

Around the time of the purchase of the Large Diamond Collection, Lazar informed Harris and Elena that he paid Runte with two-thirds of the $1.1 million proceeds of Lazar's sale of the Blue Stone, which amounted to approximately $700,000, and returned the balance of $787,500 to Harris. Tr. 22; see Pl.'s Exs. 34, 36.[5] By mid-2006, Lazar, through MLI, had finalized the

---

[5]    At trial, Lazar contended that all monies from the sale of the Blue Stone were returned to Harris rather than to the purchase of the Large Diamond Collection. Tr. 304, 317, 388; see Def.'s Exs. B through E. Lazar also testified at trial that he personally paid the total $1.1 million purchase price for the

6

purchase and taken possession of the Large Diamond Collection. Undisputed Facts at ¶ 7; see Pl.'s Ex. 36.

In late 2005, Harris' health problems worsened. Tr. 25, 185. Shortly thereafter Usov, in 2006, with Harris' assistance, formed Pinnacle Trading Limited ("Pinnacle") in 2006 shortly thereafter, to receive certain of Harris' assets, including the diamonds relevant to the instant litigation. See Tr. 26, 150 185-87, 218-19. Usov was the sole owner of Pinnacle. Tr. 185-6.[6] Elena became a consultant at Pinnacle and was the primary person involved in dealing with its collection of stones. Tr. 27. In that capacity, Elena went to jewelry shows, investigated the value of Pinnacle's assets, and dealt directly with Lazar. Id.

In June 2006, Elena, Harris, and Lazar met to document the arrangement between the parties and confirm that Pinnacle was

---

Large Diamond Collection. Tr. 289, 292. Given the wide-spread inconsistencies between the invoices Lazar presents and the sale of the 8.36 Blue Stone—including the total carats of the invoiced stones, the number of invoiced stones, the dates of the invoices, and rebuttal testimony that more logically explains the payments—Lazar's contention is rejected. See Def.'s Exs. B through E; Tr. 483-86.

[6]     No documentary evidence was presented expressly noting a transfer of assets from Harris to Pinnacle. However, the subsequent documentation, such as the Agreement, signed on Pinnacle letterhead, and the relevant testimonial evidence presented, establishes that this transfer did in fact occur.

owner of the transferred Harris assets. Tr. 27-29; 186. Prior to the meeting, a memo agreement was created by Elena at Usov's direction using letterhead provided by Pinnacle (the "Agreement"). Tr. 28, 186; Pl.'s Ex. 1. The Agreement contained a list of stones to be consigned and which corresponded to the Large Diamond Collection. See Tr. 28, 398. Elena described the Agreement as:

[A] document between Pinnacle Trading Limited and Marc Lazar, basically confirming the terms of the agreement where the [Large Diamond Collection] would be owned in proportions one-third to Marc Lazar and two-thirds to Pinnacle Trading Limited, and any proceeds from the sale of those diamonds would be split in the one-third to Marc Lazar, two-thirds to Pinnacle Trading Limited proportion.

Tr. 27-28; see Pl.'s Ex. 1. During the meeting regarding the Agreement, the parties inspected many stones, including the stones in the Large Diamond Collection, and discussed marketing strategies for selling the stones, such as reducing the size of the largest stone in the collection, getting diamond-rating reports, and recutting stones to achieve necessary color distribution. See Tr. 31-33.

Prior to the signing of the Agreement, Elena handwrote the following onto the bottom of the document to memorialize the parties' understanding of ownership over the gems: "Percentage

8

of ownership: Marc Lazar 33% (thirty three) & Pinnacle Trading Limited 66% (sixty six)." Pl.'s Ex. 1; see Tr. 29-30. A copy of the Agreement was brought to the meeting, held at Lazar's New York office, at which point the Lazar, Elena, and Harris "discussed this deal one more time, reconfirmed all the terms and . . . signed the document." Tr. 29; see Tr. 28; Pl.'s Ex. 1.[7] The Agreement was understood to be a consignment agreement, where the stones listed in the Agreement were consigned from Pinnacle to Lazar. Tr. 30, 31, 395. The Agreement was in keeping with usual business practices between Lazar and Harris, who regularly documented their transactions. See Tr. 446, 477.[8]

---

[7]    During the meeting where the Agreement was signed, Lazar also inquired into why the stones had been transferred from Harris to Pinnacle. Elena testified that Harris wanted to transfer the stones to Pinnacle for estate-planning purposes in case "anything happen[ed]" to him; at the time, Elena explained to Lazar that both she and her father would still be involved, to which Lazar indicated acceptance and approval. Tr. 33. Additional evidence presented indicated that Lazar was aware around that time that Pinnacle, not Harris, was the owner of the stones. See Tr. 324, 407.

[8]    At different points, Lazar has testified that he first learned about the handwriting included on the Agreement either in later 2006 or 2008. See Tr. 397, 476. Lazar also stated that whenever he learned of the handwriting, he did nothing prior to the instant action to "correct" what he alleges was an incorrect statement of the arrangement, which commenced in 2013. Tr. 477. Given the difference in monetary value between what Defendant and Plaintiff claim to be the distributions, Lazar's explanation as to his actions is not credible.

## IV. **Post-Agreement Events**

In December 2007, Lazar sold three of the stones consigned to Pinnacle, two from the Large Diamond Collection and one from the Small Diamond Collection. See Undisputed Facts at ¶¶ 8-9; Tr. 73. Invoices issued in December 2007 list the total weight as 5.10 carats, see Pl.'s Exs. 12-13, which refer to three diamonds: a 2.04 marquise pink stone polished down by the time of the sale to a 2.03 carat marquise pink diamond; a 1.04 fancy intense blue diamond; and a 2.03 carat fancy deep blue heart diamond. See Tr. 36, 187-88. The 2.03 carat fancy deep blue heart diamond, part of the Small Diamond Collection, was sold for $960,000. Tr. 35, 39-40; Pl.'s Ex. 9. The other two stones, part of the Large Diamond Collection, were sold for $537,950 and $192,400. Tr. 36.

Pinnacle forwarded to Defendant an invoice for the sale in the amount of $1,446,900. See Tr. 73, 187-88, 439; Pl.'s Exs. 12-13.[9] Lazar paid Pinnacle the $1,446,900 for the sale of the

---

[9]    The handwriting on these invoice exhibits is Elena's and reflect Pinnacle internal inventory list to identify stones that were sold. See Tr. 35. The diamonds sold from the Large Diamond Collection needed to be separated out because of the two-thirds, one-thirds distribution in accord with the Agreement. Tr. 40, 73.

three stones by wire. Tr. 40, 73-74; see Pl.'s Exs. 23, 34. Lazar called Elena to confirm that the wire payments for the invoices were made. Tr. 42. Defendant's accounting records noted these wire transactions as a "purchase." Tr. 450-51.[10]

Usov formed Mervia Investments, S.A. ("Mervia") in 2008 and was its sole owner. Tr. 187. Evidence adduced established that Pinnacle transferred its ownership interests Harris' assets to Mervia, both through testimony and evidence of monies outstanding to Harris redirected to Mervia following Mervia's formation. See Pl.'s Exs. 8, 26, 34; Def.'s Ex. VV; Tr. 44, 187, 384-85.[11] Around July 15, 2008, David Dawes ("Dawes"), a director at Pinnacle and Mervia, sent Lazar a letter informing him that Dawes had had a meeting with Harris and that Dawes wanted Lazar to accept his letter, which had attached to it the list of diamonds constituting the Large Diamond Collection, as "formal authority to transfer the ownership record to the name Mervia

---

[10] At trial, Lazar contended that this transaction was actually an advance of capital to Harris of approximately a half-million dollars. See Tr. 443-44. In light of the fact that the two kept fastidious records of their transactions, see Tr. 473-74, the absence of documentation as to such a substantive loan makes Lazar's portrayal of this event not believable.

[11] These exhibits also include references to an entity called Margo Investments ("Margo"). Margo is another company that, at the time, was owned and operated by Usov. See Tr. 240-41.

Investments S.A. of Panama." Pl.'s Ex. 4 at 1; see id. at 2; Undisputed Facts at ¶ 10.[12]

Harris died in May 2010. Undisputed Facts at ¶ 2; Tr. 184-85, 188. Following Harris' death, Lazar received emails from Dawes about the diamonds in Lazar's possession. On May 14, 2010, Lazar received an email from Dawes confirming that Lazar was is "holding a substantial stock which is owned by Mervia," an email to which Lazar did not respond. Pl.'s Ex. 15; Tr. 421-22. Around December 31, 2008, Lazar received another email from Dawes confirming that diamonds Lazar was holding on the "attached list which are owned by Mervia Investments S.A., remain held by you to our order . . . . [Dawes] also wish[ed] to confirm for audit purposes that is has been agreed with [Lazar] that [Lazar] [was] to receive 33% of the sale proceeds." Def.'s Ex. NN; Tr. 409-12.

In late May 2010, Elena and Lazar had a meeting in Lazar's office. Tr. 44-45. At the meeting, Lazar "reconfirmed his understanding" of the Agreement, including the Agreement's "two-

_____

[12]     While this exhibit was the only presented documentary evidence from around the time of Mervia's formation detailing an ownership transfer of diamonds, and only for the Large Diamond Collection, subsequent dealings between the parties indicate that ownership over the Small Diamond Collection was also transferred, including Dawes' authorization allowing Elena to collect the Small Diamond Collection, as described below.

thirds/one-third ownership" distribution as to the Large Diamond Collection and that the diamond assets belonged to Mervia, and discussed offers at the time. Id.

In June 2010, Dawes informed Lazar that Lazar was to ignore any claims by Harris's children as to the consigned stones and to deal exclusively with Elena with regard to the diamond collections. See Def.'s Ex. J; Tr. 414-15. On July 6, 2010, Lazar received another email from Dawes, informing Lazar that Mervia was "fully documented as to ownership including the Collection effective as from 2008" and that Elena could recall any part of the collection at any time. Def.'s Ex. K; Tr. 417-20. Lazar testified that by this time, he knew he was dealing with Mervia with regard to the diamond collections, but that he chose not to respond to either message. See Tr. 416-17, 421.

In October 2010, Lazar and Elena met; Dawes had given Lazar authorization to allow Elena to pick up the Small Diamond Collection. See Pl.'s Ex. 21; Tr. 46. In anticipation of the meeting, Lazar prepared a "pickup memo" for Elena to pick up those diamonds. Tr. 45; see Pl.'s Ex. 10. At that meeting, Elena retrieved the entire Small Diamond Collection from Lazar except one stone that Lazar asked to keep: a 1.75 carat fancy intense

13

pink diamond, that Lazar said he was trying to sell to an "important client." Tr. 45; see Tr. 487; Undisputed Facts at ¶¶ 12-13.[13] While collecting the diamonds, Elena signed Lazar's pickup memo on behalf of Mervia. See Pl.'s Ex. 10.

In 2011, Elena and Lazar maintained contact to ensure the diamonds were sold for the best price; for example, Elena went to a jewelry show in Hong Kong to see how the Large Diamond Collection was being displayed in the booth. See Tr. 51. Around the time of the Hong Kong show, Usov attempted to contact Lazar, but Lazar did not return any phone calls or emails. See Tr. 190.

In 2011, Usov, with Elena's assistance, decided to close Mervia and transfer the assets to himself to avoid the costs associated with keeping Mervia open. See Tr. 47-48, 188-89. Around the time of Mervia's dissolution, Elena had a meeting with Lazar regarding Mervia's transfer of the diamonds to Usov and to explain the purpose of shutting down Mervia. Tr. 48, 50. Elena brought a document with her to the meeting for Lazar to execute that would confirm his assent to the transfer of the diamond assets from Mervia to Usov; Lazar made changes to the

---

[13] Lazar testified that he kept the 1.75 carat fancy intense pink diamond because Harris owed him $500,000. Tr. 435. For reasons described above, this claim is found to be not credible.

14

document's language and ultimately, along with Dawes, executed
it. See Tr. 48-50; Pl.'s Exs. 5, 29.

Throughout 2010 and 2011, Lazar did not indicate in any
writing that the Agreement was dissolved or any of the diamond
asset transfers were improper or unrecognized. See Tr. 436, 481-
82.

In early 2012, Elena had both a telephone call and meeting
with Lazar, during which time Lazar informed Elena of sales of
certain of the diamonds still in his possession.[14] Tr. 53-54;
Undisputed Facts at ¶ 14. During those conversations, Lazar
promised Elena that "the money was coming" for her from the
sales. Tr. 54. In April and May 2012, the two met to discuss the
invoice for the three stones in Lazar's possession because Lazar
indicated he did not want to deal with Usov or "any entity he
[had] dealt [with] before." See Tr. 54-55. Elena prepared an
invoice pursuant to their discussions with regard to the Large
Diamond Collection's 2.99 purplish red diamond and 1.68 carat
violet diamond, which she presented to Lazar and to which he

---

[14]    Specifically, a 2.99 purplish red diamond and 0.57 carat
round violet from the Large Diamond Collection as well as a 1.75
fancy intense found pink diamond from the Small Diamond
Collection. See Tr. 53.

15

promised he would pay. Tr. 55-57, 99-100; Pl.'s Ex. 25.[15] On June 15, 2012, Usov attempted to reach Lazar by email to discuss payment from Lazar's sale of these diamonds; Lazar did not respond. See Tr. 190-91; Pl.'s Ex. 3.

In July 2012, Elena and Lazar met again to discuss the payment for the sale of the diamond collection, a meeting which Elena tape-recorded.[16] See Tr. 78-79; Pl.'s Ex. 2. During that meeting, the two discussed Lazar's estimations of the market value of the remaining stones in the Small and Large Diamond Collection, estimates which Lazar gave to Elena. See Tr. 80-81; Pl.'s Ex. 11. During the meeting, Lazar calculated the value of the remaining Large Diamond Collection stones as $3,497,000:

---

[15]    The invoice was from Aces Advisors Corp., a company incorporated by Usov to "accommodate payment of the sale" as requested by Lazar. See Tr. 56; Pl.'s Ex. 25. The total weight on the invoice—5.31 carats—corresponds to the three diamonds Lazar sold in early 2012. See Tr. 57; *supra* at 15 n.14.

[16]    The iPhone was admitted as Plaintiff's Exhibit 28, as were the audio recordings of the July and October 2012 meetings as Plaintiff's Exhibits 2 and 28A, respectively. See Tr. 97, 199, 273. Transcripts of the audio recordings were admitted as aids to witnesses. See Tr. 88-90; Pl.'s Exs. 17, 24. Lazar challenged that the particular version of the iPhone was in existence at the time of the meeting but introduced no evidence to establish the challenge. See Tr. 374-76. Although Lazar asserted there were additional statements which were omitted, see Tr. 497-99, he did not in the main challenge the accuracy of the recording or the transcripts.

16

ELENA:     That's what I think should be done, really.
           I have a 3.5 26950, is this the right
           number?

LAZAR:     What is that for everything that--

ELENA:     That's point 57, 175 and 299--

LAZAR:     It is around 3.5 give or take, yeah.

ELENA:     Yeah, 3.5 26950. 531--

LAZAR:     I don't know exactly, but it's give or take-
           -it is what we came to last time.

                        * * * *

LAZAR:     71250 times .6666, 47495. Plus 34496--is
           3497.

ELENA:     3497?

LAZAR:     --make sense? Want to do it again?

ELENA:     Yeah. No, no. Where do you fall?

LAZAR:     I remember it around three point 5.

ELENA:     No, no, that's about right.

LAZAR:     In my mind it's 3.5 and give or take--

Pl.'s Ex. 2; see Pl.'s Ex. 17 at 20, 26. During the meeting,

Elena also discussed the possibility of Lazar buying out Usov's

interest in the remaining diamonds in the Large Diamond

Collection. Tr. 79.


     Following the July 2012 meeting, Elena also performed

market value analysis on the remaining Small and Large Diamond

                             17

Collection stones, which she discussed with Lazar in October 2012 and also recorded. See Tr. 103-04; Pl.'s Exs. 18, 28A. At the time, the total valuations of the remaining diamonds in both collections were comparable and totaled around $5 million. Compare Pl.'s Ex. 11 (Lazar's estimation of $5,044,575), with Pl.'s Ex. 18 (Elena's estimation of $5,061,380.50).

On September 19 and 28, 2012, Elena emailed Lazar asking for an update and payment; Lazar replied to the first email to say that he had tried to call but could not "get through." Pl.'s Ex. 22; see Tr. 78. Elena ultimately arranged another meeting with Lazar in October 2012. See Tr. 105.

At the October 2012 meeting, also recorded by Elena, Elena discussed these valuations with Lazar, who agreed with the amounts. See Tr. 108. At the October 2012 meeting, Elena and Lazar also discussed Elena's interest in selling the remaining diamonds and her desire to come to an agreement as to the worth of the diamonds. See Tr. 105. Specifically while discussing the valuation of the Large Diamond Collection stones, Lazar and Elena discussed percentage shares:

ELENA:    I told you if it's cash today, 1.6. 1.7.

18

LAZAR:     So 1.6, 1.7 to someone--for the whole--

ELENA:     For that whole small collection.

LAZAR:     The whole collection, not just your share?

ELENA:     The whole small collection from my share.

LAZAR:     Oh, so this--I'm trying to figure out what
           the total collection was, because I had my
           share, too.

ELENA:     Well, the total according to the paper was 3
           million 200 something.

LAZAR:     So 1.6, 1.7, you have to add 33% on top of
           it for my share.

Pl.'s Ex. 28A; see Pl.'s Ex. 24 at 27-28. During the October

2012 meeting, Lazar had "no misunderstanding as to how much he

owe[d] or what his share was." Tr. 100.


## Conclusions of Law


Plaintiff has made three claims against Defendant in

relation to contested diamonds from the Small Diamond Collection

and Large Diamond Collection: (i) breach of contract, (ii)

unjust enrichment, and (iii) account stated. Based on the

findings of fact described above, Plaintiff has proven his

case.[17]

---

[17]   As Plaintiff has proven his breach of contract claim, his
unjust enrichment claim, based on the same operative transaction

Under New York law, to state a claim for breach of contract, a plaintiff must show (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 177 (2d Cir. 2004). Plaintiff has put forward the Agreement as the breached contract, see Pl.'s Ex. 1; Defendant disputes that the Agreement is enforceable, contending instead that it lacked agreement between the parties on the crucial terms.

The facts have established the Agreement is a consignment agreement. Under a consignment agreement, one party contracts to transfer possession of goods to another for the purpose of

and facts, is duplicative and need not be addressed. See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 587 (2d Cir. 2006) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."). Similarly, as Plaintiff has proven a breach of contract claim as to the Large Diamond Collection, the discussion of Plaintiff's account stated claim need only address the Small Diamond Collection. See Media Tenor Int'l AG v. Medco Health Solutions, Inc., No. 13 Civ. 7223 (DLC), 2014 WL 2933215, at *8 (S.D.N.Y. June 27, 2014) ("If plaintiff can prove an enforceable contract, then it will be able to recover under that cause of action, and the account stated claim can be dismissed." (internal quotation marks omitted)).

resale; this is not "a sale of goods," and in a consignment agreement, the "title remains in the party supplying the goods (the consignor) until the transferee (the consignee) exercises an option to take title to the goods once certain conditions are met." United States v. Nektalov, 440 F. Supp. 2d 287, 298 (S.D.N.Y. 2006) (citing Rahanian v. Ahdout, 258 A.D.2d 156, 694 N.Y.S.2d 44, 47 (1st Dep't 1999)). "In determining whether parties intend their transaction to be a consignment, courts look to certain indicia traditionally associated with the consignment relationship." Id. at 298-99 (internal citations, omitted). However, in evaluating a consignment agreement, courts need to look at "the entire relationship between the parties" as "no single feature of that relationship can be regarded as determinative by itself." Id. at 299 n.11 (quoting C.B.S. Bus. Equip. Corp. v. Underwood Corp., 240 F. Supp. 413, 419 (S.D.N.Y. 1964)).

The facts here establish that the Agreement was a consignment between Defendant and Plaintiff's predecessors-in-interest. That consignments are frequently used in the diamond industry weigh in favor of the Agreement being viewed as such. See id. at 299 (citing 4 James J. White & Robert S. Summers, Uniform Commercial Code § 30-4, at 34 (5th ed. 2002)) (finding

21

that "consignment arrangements are frequently used in the
diamond industry" and "may weigh this fact in favor of the
existence of a consignment" but that "such a fact, in and of
itself, does not dictate" that finding).

The facts surrounding the Agreement support this
conclusion. As found above, the evidence established that the
parties agreed that to raise funds to buy the Large Diamond
Collection from Runte, Harris delivered to Lazar the 8.36 Blue
Stone so that Lazar could sell the Blue Stone and use the
proceeds to purchase the Runte's collection. No documentary
evidence or credible testimony has established that Defendant
paid anything for the Large Diamond Collection or that Defendant
returned all monies to Harris for the sale of the Blue Stone.
The Agreement memorialized the resultant consignment of the
Large Diamond Collection's diamonds from Harris to Lazar and
laid out the percentage distribution for monies earned from the
sales of those stones. In the years following the Agreement,
there were numerous communications between Defendant, Plaintiff,
Harris, Elena, and Dawes as to Plaintiff and Plaintiff's
predecessors-in-interest's ownership of the diamonds, which are
described above and to which Lazar never expressed any
indication that such an arrangement was not the case. Lazar's

communications with Dawes and Elena, as most notably established
by the recorded meetings, are further evidence that Lazar was
aware, understood, and accepted the transfer of ownership as to
Harris' diamonds from Harris to Pinnacle, Mervia, and, lastly,
to Plaintiff.

Lazar's conduct in partial performance of the Agreement is
"an unmistakable signal" of the consignment contractual
agreement and demonstrates that Lazar understood "a contract to
be in effect." R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d
69, 75-76 (2d Cir. 1984). As found above, after Lazar sold two
stones from the Large Diamond Collection, Pinnacle invoiced
Lazar for those said stones in accord with the Agreement's two-
third and one-third percentage terms, and Lazar paid. That
partial performance confirms the existence of the Agreement and
Lazar's agreement to its terms. See, e.g., Nat'l Trends, Inc. v.
Krimson Corp., No. 91 Civ. 3178 (KMW) (LB), 1994 WL 97058, at
*11 (S.D.N.Y. Mar. 23, 1994) (noting that partial performance is
"useful to determine the parties' intent" and that such intent
may be ascertained by parties' "expressed intentions, the words
and deeds which constitute objective signs in a given set of
circumstances" (citation omitted)).

Lazar has failed to perform the consignment by returning to Usov the moneys received by him for Usov's share of diamonds sold. Accordingly, Plaintiff is entitled to two-thirds of those sales and two-thirds of the value of the remaining diamonds in that collection still held by Lazar.

Plaintiff has also established his account stated claim as to the Small Diamond Collection. To state a claim for an account stated, a plaintiff must plead that there was "a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." White Diamond Co. v. Castco, Inc., 436 F. Supp. 2d 615, 623 (S.D.N.Y. 2006); see also Abbott, Duncan & Wiener v. Ragusa, 214 A.D.2d 412, 413, 625 N.Y.S.2d 178 (1st Dep't 1995) ("An account stated is an account, balanced and rendered, with an assent to the balance either express or implied. There can be no account stated where no account was presented or where any dispute about the account is shown to have existed.")

The facts as found above confirm an agreement as to the Small Diamond Collections as alleged by Plaintiff. The evidence has established that Harris and Defendant agreed that Harris would receive all of the proceeds from sales of the Small

24

Diamond Collection, an ownership right shown to be transferred ultimately to Plaintiff. The facts have established that Defendant has breached that agreement by retaining the monies owed from Lazar's sale of the diamond from the Small Diamond Collection. Accordingly, Plaintiff is entitled to one hundred percentage of the value of the sale of the remaining Small Diamond Collection diamond in Lazar's possession.

**Conclusion**

For the reasons set forth above, Plaintiff is entitled to two-thirds of money received from sales of diamonds from the Large Diamond Collection, two-thirds of the value of the diamonds in the Large Diamond Collection retained by the Defendant, monies received from the sales of diamonds in the Small Diamond Collection, and judgment with costs and disbursements.

Settle judgment on notice.

It is so ordered.

**New York, NY**
**August /0, 2017**

ROBERT W. SWEET
**U.S.D.J.**

26